**Susan M. MAXWELL, Plaintiff,**

v.

**K MART CORPORATION, Melville Corporation, Morse Shoe, Inc. and Shopko Stores, Inc.**

**Civ. No. 4–93–525.**

United States District Court, D. Minnesota, Fourth Division.

March 2, 1994.

Earl D. Reiland, Daniel W. McDonald, Stephanie J. Smith, Alan Gerard Gorman, Merchant, Gould, Smith, Edell, Welter & Schmidt, Minneapolis, MN, for Susan M. Maxwell.

David Richard Fairbairn, Kinney & Lange, Minneapolis, MN, Alan L. Unikel, Robert J. McMurtry, Timothy L. Swabb, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for K Mart Corp.

David Richard Fairbairn, Thomas J. Stueber, Joseph R. Kelly, Kinney & Lange, Minneapolis, MN, Alan L. Unikel, Robert J. McMurtry, Timothy L. Swabb, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Melville Corp.

Bruce Howard Little, Popham, Haik, Schnobrich & Kaufman, Minneapolis, MN, James J. Foster, David Wolf, Wolf, Greenfield & Sacks, Boston, MA, for Morse Shoe, Inc., and Shopko Stores, Inc.

## ORDER

DOTY, District Judge.

This matter is before the court on cross-motions for partial summary judgment brought by defendants Morse Shoe, Inc. ("Morse") and Melville Corporation ("Melville") and plaintiff Susan Maxwell ("Maxwell"). Based on a review of the file, record and proceedings herein, the motions of defendants and Maxwell for partial summary judgment are granted in part and denied in part.[1]

## BACKGROUND

This case concerns various systems used to connect shoes which do not have laceholes, buckles or other apertures through which a filament can be threaded to join the shoes. Before 1983, discount stores connected shoes without apertures by punching holes in each shoe and passing a filament through the holes. The method was not ideal, however, because it left a permanent blemish on the shoes.

Maxwell is the owner of record and named inventor of United States Patent No. 4,624,-060 (" '060 patent" or "Maxwell patent"). The patent claims a "system for connecting mated pairs of shoes to prevent separation and possible mismatching when offered for sale in self-service stores." Maxwell patent, abstract. Maxwell filed an application for a patent on October 6, 1983, and a patent was issued on November 25, 1986.

The '060 patent describes a system that threads a filament through loops or fastening tabs secured between the inner and outer soles of each shoe of a mated pair. Maxwell's shoe connection system securely joins mated shoes together without damaging the shoes. The loops used to attach the shoes are not visible when the shoes are worn and do not irritate the wearer. In 1985, Maxwell granted Target Stores a non-exclusive license to use the attachment system on shoes purchased for resale. Once Target began using Maxwell's shoe connection system, other discount retailers, including the defendants, followed suit.

Defendant Morse sells shoes through large discount retail stores, such as Fayva. Defendant Melville has a license with K mart Corporation to operate the shoe departments in all K mart stores. In 1990, Morse and Melville tried but failed to negotiate a license with Maxwell. Morse and Melville then developed and currently use alternative shoe connection systems which secure the loop or fastening tab in a different location within the shoe.

Maxwell filed suit alleging that defendants Morse and Melville, as well as others, sold shoes using attachment systems that violated the '060 patent. Defendants contend that they have successfully designed around the '060 patent and seek summary judgment that their current shoe connection systems do not infringe Maxwell's patent. Maxwell seeks summary judgment that the various connection systems used by defendants infringe her patent.

## DISCUSSION

The court applies the same summary judgment standard to motions involving patent claims as it does to motions involving other types of claims. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed.Cir.1988) ("It is no longer debatable that the issues in a patent case are subject to summary judgment."); *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984) ("[T]he statutory purposes of the grant of summary judgment under Fed.R.Civ.P. 56 are without question intended to be effectuated in patent litigation as in any other type of suit and in accordance with the same standard.") (footnote omitted). Disagreement over the meaning of a term within a claim does not necessarily create a genuine issue of material fact. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed.Cir.1990).

The court should grant summary judgment "if the pleadings, depositions, an-

---

1. K mart Corporation filed a motion to dismiss Maxwell's complaint. The court addresses that motion by separate order.

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

■ On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

**1. The '060 Patent**

The '060 patent describes a pair of shoes, "each of which has a fastening tab firmly secured thereto and with a hole at one end or with a loop formed by doubling of the tab,

and a filamentary fastening element extending through the holes or loops of each of the fastening tabs, the ends of the filamentary element being joined together in a closed loop." Maxwell patent, col. 1, lines 49–55. The fastener tab is "secured by means of strong adhesive, stitching, staples, or all three, to the bottom sole of the shoe and the inner sole applied on top of the adhered portion of the fastening tab." Maxwell patent, abstract.

■ The '060 patent asserts two independent claims, claims 1 and 3.[2] Maxwell's claims of infringement focus on claim 3, which embodies the following limitations:

3. A system for attaching together mated pairs of shoes, which comprises in combination:

(A) A pair of shoes, each of which has an inner sole and an outer sole, said inner sole having a side edge, each shoe also having a shoe upper with an inside surface and a top edge, each of said shoes further having a fastening tab and means for securing said tab between said inner and outer soles,

(1) said fastening tab being an integral sheet with two parts,

(2) the first of said parts extending horizontally between the outer sole and the inner sole of the shoe and being firmly secured thereto with said securing means,

(3) the second of said parts comprising the opposite end of the tab extending from the first of said parts at the side edge of the inner sole upwardly along the inside surface of the shoe upper and extending so that said opposite end remains beneath the top edge of said shoe upper,

(4) the second of said parts having an aperture adjacent to its outermost end

(B) a fastening element extending through the apertures of each of said fastening tabs, the ends of the element being joined together in a closed loop;

2. Claim 2 is dependent upon claim 2; claim 4 of the patent depends upon claim 3. A dependent claim cannot be infringed unless the claim which

it incorporates is infringed. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989).

whereby said pair of shoes is attached together by said fastening element passing through the aperture in each of said tabs so that on removal of said fastening element, said shoes separate and said tabs are not visible outside said shoe uppers.

Maxwell patent, col. 4, lines 15–44.

Claim 1, another independent claim, contains essentially the same limitations as to location as claim 3, but describes the use of a tab folded over to form a loop as an aperture instead of a tab with a hole at one end. Maxwell patent, col. 3, lines 22–47 and col. 4, lines 1–9. Claim 1 describes the first part of the fastening tab as "one end of the elongated tab extending horizontally between the inside surfaces of the outer sole and inner sole of the shoe and firmly secured thereto with said securing means." Maxwell patent, col. 3, lines 33–37. The opposite end of the "elongated tab" extends "from one edge of the inner sole and vertically upward along but spaced from the inside surface of the shoe upper and extending so that said opposite end remains beneath the top edge of said shoe upper." *Id.* at lines 39–44. The second part of the tab has an aperture "in the form of a loop formed by doubling the fastening tab over on itself." *Id.* at lines 45–47.

## 2. The Accused Devices

The accused devices are several types of shoe connection systems currently used by defendants Morse and Melville. Maxwell claims that the following systems infringe the '060 patent either literally or under the doctrine of equivalents.

### A. The Counter Pocket System

For shoes that do not have a suitable aperture but do have a counter pocket, both Morse and Melville now use shoe connecting systems in which a loop or fastening tab is sewn to the counter pocket of the shoe. A counter pocket is a stiff structure that provides support for the heel of the shoe and extends vertically on the inside of the shoe upper to the topline in a semicircle around the heel area. One end of the tab is stitched under the vertical seam of the counter pocket lining at a point midway between the insole and the topline near the rear of the shoe upper. The other end of the tab extends horizontally toward the front of the shoe and forms a loop. The loops are connected by a filament and are not visible outside the shoes when the shoes are worn.

### B. Morse's Topline System

Morse employs a slightly different shoe connection system for shoes that have neither an aperture or counter pocket. The loops are attached to the top of the shoe upper lining at the topline of the shoes. The loops extend above the topline of the shoes and are connected by a filament. Morse contends that the loops are visible outside the shoe once the filament is removed. Maxwell insists that the loops are generally not visible when the shoes are worn.

### C. Melville's Boot Systems

Melville uses a connection system that it calls the "first boot system" to join mated boots that have a vertical seam and a boot strap. One end of the tab is stitched under a vertical seam on the side of the boot upper near the top. The upper end of the seam is covered by a bootstrap. The tab extends horizontally from the seam toward the rear of the boot. The other end of the tab extends horizontally toward the front of the boot and forms a loop. The loops are connected by a filament threaded through the loops.

To join boots that do not have a vertical seam on the boot upper, Melville uses the "second boot system." One end of the tab is stitched to a seam at the topline of the boot upper. The other end of the tab extends either vertically upward or horizontally toward the center of the boot and forms a loop. The loops extend above the topline of the boot and are connected by a filament. Melville insists that the loops are visible outside the boot after the filament is removed. Maxwell contends that the loops are generally not visible when the boots are worn.

### 3. Infringement

 Maxwell, the patentee, has the burden of proving infringement. *SmithKline*

*Diagnostics, Inc. v. Helena Lab Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). Maxwell can establish infringement under either of two theories, literal infringement or infringement under the doctrine of equivalents.

## A. Literal Infringement

Maxwell asserts that the counter pocket system, Morse's topline system and Melville's first boot system literally infringe the '060 patent. To establish literal infringement, Maxwell must show that the properly interpreted claims of the '060 patent describe the accused device. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). A literal infringement analysis entails two steps. First, the court interprets the patent's claims. *Becton*, 922 F.2d at 796 (citation omitted). Claim interpretation is a question of law to be decided by the court. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 822 (Fed.Cir.1992). The court construes the claim "in light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device." *SRI Int'l v. Matushita Elec. Corp. of America*, 775 F.2d 1107, 1118 (Fed.Cir.1985) (en banc) (emphasis in original). Second, the court compares the accused device to the interpreted claims. *Becton* 922 F.2d at 796.

Literal infringement requires that every limitation of a patent claim be found in the alleged infringing product. *Uniroyal, Inc. v. Rudkin Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). *See Pennwalt*, 833 F.2d at 934 (literal equivalency is not involved if "the required function is not performed *exactly* in the accused device."). If one claim limitation is missing, there is no infringement as a matter of law. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed.Cir.1991). A dispute over a term within the claims does not generally create a fact question. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579–80 (Fed.

Cir.1989); *Becton,* 922 F.2d at 797. When the meaning of a term used in the claims is disputed, the court looks to the language of all the claims, the specification, the prosecution history and the prior art. *Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1566 (Fed.Cir.1992).

Maxwell contends that the counter pocket system literally infringes claim 3 of the '060 patent. The validity of Maxwell's literal infringement claim turns on her interpretation of the term "fastening tab." The loop in the counter pocket system is not secured "between the outer sole and the inner sole of the shoe" as required by claim 3. Maxwell contends that the term "fastening tab" does not merely designate a tab separate from the shoe but also encompasses shoe parts. Maxwell argues that the loop and the counter pocket together perform like the "fastening tab" described in the '060 patent claims. In the counter pocket system, the loop is attached to a counter pocket which extends horizontally to the bottom of the shoe; the counter pocket is secured between the inner and outer soles. Because claim 3 refers to the fastening tab as an "integral sheet," Maxwell contends that the counter pocket is properly considered part of the fastening tab and thus concludes that the "tab" is secured where claim 3 literally requires.

Maxwell makes a similar argument in support of her argument that Morse's topline system and Melville's first boot system literally infringe claim 3 of the '060 patent. Maxwell contends that the fastening tab is the "integral sheet" comprised of the loop and the shoe upper lining. Because the shoe upper lining extends horizontally to the bottom of the shoe and is stitched or glued between the soles, Maxwell maintains that the tab in the topline system is secured where claim 3 literally describes.

The patent does not support Maxwell's contentions. It is obvious that the interpretation urged by Maxwell differs from the ordinary meaning of "tab."[3] While the

---

3. The court may consult the dictionary to establish the "ordinary" meaning of a disputed term. *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948,

951 & n. 8 (Fed.Cir.1993). *See Webster's II New Riverside University Dictionary* (1984) (defining "tab" as "a projection, flap, or short strip at-

inventor can be her own lexicographer, the terms in a claim must be given their ordinary meaning unless it appears from the patent that the inventor used them differently. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed.Cir.1992) (citation omitted). The fastening tab, both as described in the claims and depicted in the drawings, is an item separate from the counter pocket or the upper of the shoes. There is nothing in the patent language to indicate that the term "tab" is used in an uncommon way. Nor does the patent language indicate that "fastening tab" includes other shoe parts.

■ The specification of the '060 patent does not indicate that Maxwell intended the term "tab" to have another meaning. *See Minnesota Min. and Mfg.*, 976 F.2d at 1566 (court may refer to specification in defining terms used in patent claim).[4] In fact, the opposite is true; the specification reinforces the court's reading of "fastening tab." The statement in the specification that the patented system "comprises in combination a pair of shoes, each of which has a fastening tab firmly secured thereto" indicates that the tab is a separate item and does not encompass shoe parts. Maxwell patent, col. 1, lines 49–50. The specification also states that "[e]ach fastening tab is formed from elongated narrow strong sheet material, such as synthetic resinous plastic material and each fastening tab has two parts." *Id.* col. 1, lines 55–58.

The specification notes that, "[although shown as rectangular, the tab may obviously have rounded ends or may be in the form of an elongated oval, or the like." *Id.* col. 3, lines 10–12. Moreover, the statement that

the second part of the tab "extends upwardly along the inside surface of the upper body of the shoe, but spaced therefrom," demonstrates that the tab is an item different from the upper shoe lining. *Id.* col. 1, lines 64–66. The statement that "the tabs may be stitched into a lining seam of the shoes at the sides or back of the shoes," also indicates that neither the upper shoe lining or the counter pocket is part of the fastening tab itself. *Id.* col. 2, lines 41–43.[5]

At oral argument, Maxwell asserted that her interpretation does not require the court to consider the entire counter pocket a component of the fastening tab. Rather, Maxwell argued that only the portion of the counter pocket between where the loop is actually attached and the bottom of the shoe functions as the tab. Maxwell made a similar argument concerning the topline system, in that the strip of shoe lining that extends from the top of the shoe where the loop is attached to the bottom of the shoe, rather than the entire shoe upper lining, operates as the fastening tab. Thus, Maxwell contends that the loop, combined with a portion of the counter pocket or upper lining which is stitched to the loop and extends between the soles of the shoes, provides a "tab" within the literal meaning of claims 1 and 3. This argument does not help Maxwell establish literal infringement because it finds no support in the patent language, drawings or specification.

■ If Maxwell wished or intended to use the term "tab" in some particular way other than that understood by one of ordinary skill in the art at the time the patent

tached to an object to facilitate opening, handling or identification."); *Random House Dictionary of the English Language* (1969) (defining "tab" as "a small flap, strap, loop, or similar appendage, as on a garment, used for pulling, hanging, decoration, etc.").

4. The court is mindful that, although the claims are interpreted in light of the specification, statements in the specification should not be read into the claims as limitations.

5. *See also* Maxwell patent, col. 1, lines 59 & 62–63 ("one end of the elongated tab ... the opposite end of the elongated tab"); *Id.* col 1., line 68 and col. 2, line 1 ("loops caused by doubling the

tabs"); *Id.* col. 2, lines 21–26 ("At the time of manufacture, each shoe is provided with a fastening tab ... [the tab] is thin flat and elongated formed from strong sheet material, such as plastic impregnated cloth, polyester film such as Mylar, or similar strong material which is resistant to tearing."); *Id.* col. 3, lines 5–7 ("typically the fastening tab may be between about ¼ to ¾ inch in width and 1½ to 3 inches in length"); *Id.* col. 3, lines 8–10 ("Approximately one-half of the length of the tab should be secured between the inner and outer soles."); *Id.* abstract ("The tab comprises a length of narrow strong sheet material having a hole or loop at one end for receiving a fastening filament.").

application was filed, she must have defined it in the patents prior to issuance. This she did not do. Nothing in the patent or the specification would have put one of ordinary skill in the art on notice that the term "tab" meant other than what it says. The court holds that neither the counter pocket or the shoe upper lining can be considered part of the "tab" as that term is used in the patent. Rather, the court concludes that the term "tab" must be given its ordinary meaning.

The court concludes that the accused devices do not contain the element in claim 3 that the first part of the "fastening tab" extend "horizontally between the outer sole and the inner sole of the shoe and [be] firmly secured thereto." Nor do the accused devices contain the element in claim 1 that the first part of the "fastening tab" extend "horizontally between the inside surfaces of the outer sole and inner sole of the shoe and [be] firmly secured thereto." The counter pocket is not part of the fastening tab described in the '060 patent. It is a part of the shoe upper serving an independent purpose which is present regardless of what shoe connection system is employed. For the same reasons, the shoe upper lining cannot be considered part of the fastening tab;[6] the same reasoning applies to Maxwell's claim that Melville's first and second boot systems literally infringes her patent. Because the tabs in the accused systems are not secured between the outer soles and inner soles of the shoe, the court holds that Maxwell's literal infringement claim fails as a matter of law.

**B. Infringement under the Doctrine of Equivalents**

 Even if there is no literal infringement, there may still be infringement under the doctrine of equivalents. The doctrine recognizes that a patented invention may be infringed not only by a device precisely described in a patent claim, but also by a device that falls outside the literal claims but is substantially the same thing, used in substantially the same way, to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Application of the doctrine of equivalents is the exception, not the rule. *London*, 946 F.2d at 1538. The doctrine applies where an infringer, instead of inventing a new device, merely makes a small change, essentially "stealing" the invention by appropriating "the essence of an invention while barely avoiding the literal language of the claims." *Id.* (citations omitted).[7]

 The doctrine of equivalents requires the trier of fact to balance the competing public policies of avoiding "a fraud on the patent," and the need for reasonable certainty by the public as to the scope of the patent grant. *Graver Tank*, 339 U.S. at 607–08, 70 S.Ct. at 855–56. Thus, while claims must give the public "fair notice" of the "metes and bounds of the claimed invention," the patentee should not be deprived of the benefits of the patent by competitors who essentially pirate the invention. *London*, 946 F.2d at 1538. In applying the doctrine, however, the court must "avoid significant conflict with the fundamental principle that claims define the limits of patent protection." *Charles Greiner & Co. v. Mari–Med Mfg.*, 962 F.2d 1031, 1036 (Fed.Cir.1992) (citation omitted).

 Infringement under the doctrine of equivalents "does not require complete identity for every purpose and in every respect," but does require substantial identity of function, means and result. *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. The patent holder has the burden of showing that the accused device has elements, steps or limitations that "perform substantially the same function in substantially the same way to

6. The court rejects Maxwell's suggestion that only the outside layer is the shoe upper. The term upper is widely regarded as encompassing all of the upper parts of a shoe stitched together, including both the inside and the lining of the shoe.

7. The Supreme Court of the United States created the doctrine of equivalents to make it impossi-

ble for "the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent, which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank*, 339 U.S. at 607, 70 S.Ct. at 856.

obtain the same result." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856 (citation omitted).

▮ The proper focus is on whether the accused devices are equivalent to the claim limitations, not on whether they are equivalent to the invention. The patent holder must establish each element or its substantial equivalent in the accused device and show that every limitation is met equivalently. *Intellicall*, 952 F.2d at 1389 (citation omitted). A "substantial equivalent" of an element is one that fails to "substantially change the way in which the function of the claimed invention is performed." *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed.Cir.1987). Equivalency and infringement are questions of fact. *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 986 (Fed.Cir.1989); *see Pennwalt*, 833 F.2d at 936 (equivalency of claim limitations and accused structure is a question of fact).[8]

▮ In the present case, as often happens in cases involving the doctrine of equivalents, there is no material dispute about the function or result prongs of the test. It is not disputed that the accused devices perform substantially the same function and achieve the same result as the patented shoe connection system. That is, the accused devices connect mated pairs of shoes together in a secure manner which does not damage the appearance of the shoes. The issue is whether the accused devices perform the function and achieve the same result in substantially the same way as Maxwell's patented system.

The doctrine of equivalents is based on substantial, not exact, identity of ways. To work in substantially the same way, all the limitations of a patent claim must be satisfied at least equivalently. Maxwell contends that placing the tabs in a different location within the shoe does not change the way the accused systems work as compared to the pat-

ented invention. Defendants insist that the way the accused shoe attachment systems obtain the result differs substantially from Maxwell's patented system. The court concludes that the evidence, taken in favor of Maxwell, does not show that the accused devices are so far changed in principle that they perform the same function in a substantially different way. Thus, the question of infringement by equivalency cannot be decided by the court as a matter of law.

The significance of the similarities and differences between the accused and patented systems presents a genuine issue of material fact to be resolved by the jury. A reasonable jury could find that the accused systems are merely an insubstantially altered form of the invention set forth in the claims. A reasonable jury could also find that, although the accused systems technically escape the claim language, the systems contain an equivalent for each claim limitation that is not met literally. The evidence would permit a reasonable jury to find that the tabs in the accused systems, although placed at the side or back of the shoes, operate in a mode similar, if not identical, to the patented system. In sum, a reasonable jury could conclude that, although the tabs are secured in different locations within the shoe, there are no substantial differences in how the shoe attachment systems work.

▮ Defendants insist that they successfully "designed around" the system claimed in Maxwell's patent. Although designing or inventing around patents to make new inventions is encouraged, piracy is not. *London*, 946 F.2d at 1538 (citing *Graver Tank*, 339 U.S. at 609–10, 70 S.Ct. at 856–57).[9] Where an infringer merely makes an insubstantial change, essentially misappropriating the patented invention, infringement by equivalence may lie. It is undisputed that defendants knew of the '060 patent at the time they

---

8. Infringement by equivalency is a question for the jury. *See Sun Studs*, 872 F.2d at 986 & 988 (reversing district court's overturning of jury verdict on infringement by equivalency); *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425–26 (Fed.Cir.1989) (stating that jury must be properly instructed on each element of the doctrine of equivalents).

9. The court recognizes that intentional designing around the claims of a patent is not "by itself a wrong which must be compensated by invocation of the doctrine of equivalents." *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed.Cir.1991).

devised the accused systems. The evidence, taken most favorably to Maxwell, also shows that defendants attempted to avoid infringement by making only minimal changes while maintaining the same function. A reasonable jury could conclude that the minimal changes adopted by defendants fail to avoid infringement under the doctrine of equivalents. The court concludes that defendants are not entitled to summary judgment on Maxwell's claim of infringement under the doctrine of equivalents.

Defendants also argue that infringement under the doctrine of equivalents is precluded because their shoe attachment systems practice the prior art disclosed in the Nelson and Ornsteen patents. Maxwell cannot, of course, use the doctrine of equivalents to extend the right to exclude others so broadly as to ensnare subject matter within the public domain. *Wilson Sporting Goods Co. v. Geoffrey and Assocs.*, 904 F.2d 677, 683–84 (Fed.Cir.1990). *See Black & Decker, Inc. v. Hoover Service Center*, 886 F.2d 1285, 1293 (Fed.Cir.1989) ("the range of equivalents to which a claimed invention is entitled may never be so great as to encompass a structure in the prior art"). That truism, however, is of no avail to defendants because the hypothetical claim drawn to encompass the accused devices would not have been obvious under 35 U.S.C. § 103 in view of the prior art.

Defendants cannot rely on the Nelson patent because Maxwell did not need to distinguish that device during the prosecution history.[10] The Ornsteen patent describes a shoe connection system which uses elongated tabs to join mated pairs of shoes displayed at discount retail stores. One end of each tab is attached to the outside of the shoe, either between the sole and the shoe upper, between the heel and the shoe upper or on the bottom of the shoe. The opposite end of each tab is equipped with a snap fastener. Because the Ornsteen device attaches the tabs to the outside of the shoes, it does not secure the tabs in a manner which allows the

tabs to be invisible when the shoes are worn. The tabs in the accused devices, however, are secured inside the shoes and are not visible when the shoes are worn.

### C. Maxwell's Motion for Summary Judgment

There is one aspect of Maxwell's motion for summary judgment that has not been addressed above. Maxwell contends that the evidence overwhelmingly shows that the original shoe connection system used by Morse and Melville literally infringed her patent. Defendants concede that they may have used an attachment system identical to the one invented by Maxwell. Defendants dispute, however, the extent to which such a system was actually used, when Maxwell marked substantially all shoes sold with the patented fasteners and when Maxwell gave defendants actual notice of infringement. The court concludes that material fact disputes exist concerning the extent of infringement and when notice, whether constructive or actual, occurred.

### CONCLUSION

The court concludes that the accused shoe connection systems do not literally infringe Maxwell's patent as a matter of law. Material issues of fact remain, however, concerning Maxwell's claim of infringement under the doctrine of equivalents. Based on the foregoing, **IT IS HEREBY ORDERED** that Maxwell's motion for summary judgment is denied and the motion of defendants Morse and Melville for summary judgment is granted in part and denied in part.

---

10. The Nelson patent describes a fastening means to prevent separation of rubbers, overshoes or other foot coverings. A flexible strip is permanently attached to the upper interior side of each rubber. The free ends of the strips have fastening means, consisting of a button and button-hole, a hook and an eye or a buckle, which can be engaged and detached.